# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-1004V
### Filed: November 7, 2018
PUBLISHED

|  |  |
|---|---|
| ANNE KNUDSON,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages;<br>Decision on the Written Record;<br>Tetanus, Diphtheria, Acellular<br>Pertussis (Tdap) Vaccine; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA) |

*Shealene Priscilla Wasserman, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Christine Mary Becer, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On July 26, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury caused by her Tetanus, Diphtheria, Acellular Pertussis ("Tdap") vaccination. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters and the undersigned issued a Ruling on Entitlement finding petitioner entitled to compensation for a Shoulder Injury Related to Vaccine Administration or "SIRVA." For the reasons discussed below, the undersigned now awards compensation in the amount of $110,305.07.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.      Procedural History

On July 26, 2017, along with her petition, petitioner filed medical records and an affidavit marked as exhibits 1-6.  (ECF No. 1).  However, petitioner did not file a statement of completion until August 3, 2017.  (ECF No. 9).  Subsequently, during the initial status conference held September 7, 2017, petitioner indicated that she would inquire as to whether there were more detailed vaccination records.  (ECF No. 10).  On September 12, 2017, petitioner filed a more detailed vaccination record marked as exhibit 6.[3]  (ECF No. 11).  On October 18, 2017, petitioner filed additional medical records marked as exhibit 7.  (ECF No. 15).

On April 23, 2018, respondent filed his Rule 4(c) report in which he conceded that petitioner was entitled to compensation in this case.  (ECF No. 26).  On April 23, 2018, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for her SIRVA.  (ECF No. 28).  The parties then began the process of negotiating the appropriate amount of damages.

On May 3, 2018, petitioner filed a status report indicating the parties had reached an impasse during settlement discussions.  (ECF No. 30).  Petitioner filed a status report on May 8, 2018 clarifying that the issue of disagreement concerned the appropriate amount to award petitioner for her past pain and suffering.  (ECF No. 32).  Petitioner indicated that she was not alleging ongoing sequela subsequent to January 30, 2017.  *Id.*  Petitioner asserted that she preferred to resolve damages through briefs (and ruling on the record) while respondent would defer to the Court.  *Id.*  On May 9, 2018, a scheduling order was issued noting that the undersigned was amenable to proceeding with a briefing schedule and setting a deadline for a joint status report.  (ECF No. 33).  In the scheduling order, the undersigned urged the parties to consider mediation.  *Id.*  On May 18, 2018, the parties filed a joint status report indicating that they felt mediation would be inappropriate in this case.  (ECF No. 34).  The report noted that petitioner intended to file pain and suffering affidavits for consideration.  *Id.*  On July 3, 2018 and July 11, 2018, petitioner filed affidavits marked as exhibits 8-15 (ECF Nos. 36, 38).  On August 27, 2018, the parties filed a joint status report indicating that the evidentiary record in the case was complete and that they wished to proceed to a decision on the written record.  (ECF No. 41).

The parties filed simultaneous briefs discussing the damages issues in this case on October 9, 2018.  (ECF Nos. 43, 44).  This case is now ripe for a determination regarding petitioner's pain and suffering award of damages.

---

[3] Because petitioner had previously designated her affidavit as Exhibit 6, this record will be referred to herein as Exhibit 6a.

## II.      Relevant Medical History

Petitioner received a Tdap vaccination in her left shoulder on March 14, 2016. Ex. 1 at 2; Ex. 6a at 1.  The available medical evidence of record does not reflect a history of left shoulder impairment.

Approximately two weeks following her vaccination, on March 31, 2016, petitioner presented to Nicholas Franssen, NP, at Aspirus Medford Hospital with complaints of "left arm soreness after a Tdap injection on [March 14, 2016]."  Ex. 2 at 214.  Petitioner reported that her pain started in the "deltoid/mid bicep area" and radiated to the elbow.  *Id.*  She stated that she experienced pain with movement of her arm and rated her current pain as "8" out of "10."  *Id.*  On examination, petitioner was observed to have muscle strength of 5/5 in both upper extremities and no evidence of joint swelling.  *Id.* at 215.  Mr. Franssen suggested over-the-counter NSAIDs or acetaminophen for pain control and recommended a course of physical therapy for treatment of petitioner's symptoms.  *Id.*

On April 1, 2016, petitioner presented to Andrew Rawlsky, DPT, at Aspirus Pleasant View Outpatient Therapies for an initial evaluation.  Ex. 4 at 1-4.  Petitioner reported that she had not "been able to [move] her [left] arm" since receiving her Tdap vaccination and rated her current pain as "6" out of "10."  *Id.* at 1-2.  An examination of petitioner's left shoulder documented evidence of positive Neer impingement, 90 degrees of active flexion range of motion, 90 degrees of abduction, and 50 degrees of external rotation.  *Id.* at 2.  Petitioner attended a total of four physical therapy sessions through May 6, 2016.  *Id.* at 1-12.  In a discharge summary completed on May 24, 2016, Mr. Rawlsky noted that petitioner continued to experience shoulder pain, but her overall symptoms had improved.  *Id.* at 11.  Petitioner was to continue with a home exercise program.  *Id.*

On April 15, 2016, petitioner presented for a follow-up visit with Mr. Franssen with complaints of recurrent left upper extremity pain that started after her Tdap vaccination.  Ex. 2 at 225.  Petitioner reported pain when putting her arm behind her back and radiation of pain from her neck through the elbow and wrist area.  *Id.*  Petitioner indicated that her physical therapy treatment had provided only limited improvement of her symptoms.  *Id.*  She rated her current pain as "4" out of "10."  *Id.*  On examination, Mr. Franssen observed that petitioner presented with decreased range of motion of the left upper extremity, pain with movement of the arm behind the back, pain with lifting the arm above 20 degrees, and muscle strength of 4/5.  *Id.* at 226.  Mr. Franssen prescribed Mobic and referred petitioner for further orthopedic evaluation and treatment.  *Id.* at 227, 229.

On April 18, 2016, petitioner presented to Kelsey J. Krug, PA-C,[4] at Bone & Joint at Medford for evaluation of left arm pain that began after her Tdap injection on March

---

[4] The available medical records contain references to both "Kelsey J. Krug, PA-C" and "Kelsey J. Brost, PA-C" as petitioner's treating provider at Bone & Joint at Medford.  *See, e.g.,* Ex. 3 at 3, 7.  A review of

14, 2016.  Ex. 3 at 26.  Petitioner indicated that her pain had improved by 75% after taking Mobic and rated her current pain as "1-2" out of "10."  *Id.*  However, petitioner reported that she continued to experience radiating pain from the bicep into the superior shoulder with rotation of the arm.  *Id.*  On examination, petitioner presented with tenderness to palpation along the left biceps and distal biceps tendon and exhibited pain with empty can and resisted deltoid and shoulder external rotation.  *Id.* at 29-30.  Given petitioner's favorable response to medication, Ms. Krug advised her to continue taking Mobic and further recommended that she continue formal physical therapy.  *Id.* at 31.

On May 9, 2016, petitioner returned for a follow-up visit with Ms. Krug.  *Id.* at 35.  Petitioner continued to report pain in the bicep area that radiated into the superior shoulder with rotation of the arm, pushing, and abduction.  *Id.*  In addition, petitioner noted that she experienced constant numbness of the left upper arm.  *Id.* at 39.  On examination, petitioner presented with tenderness to palpation over the left biceps and triceps and exhibited pain with flexion and abduction of the left shoulder.  *Id.* at 38.   Ms. Krug recommended that petitioner undergo EMG/NCV testing of her left upper extremity and continue physical therapy.  *Id.* at 39.

On June 8, 2016, petitioner presented to Kulpreet K. Sahota, M.D., at Bone & Joint Center to undergo EMG/NCV testing.  *Id.* at 73.  Petitioner reported that she had experienced left arm pain "since a tetanus shot in March/April 2016" with decreased grip strength.  *Id.* at 73.  However, petitioner denied numbness or tingling, dropping objects, or nocturnal paresthesia.  *Id.*  EMG/NCV testing of petitioner's left upper extremity revealed evidence of "moderate left ulnar mononeuropathy via entrapment of the ulnar nerve by the deep flexor-pronator aponeurosis."  *Id.* at 75.  The aforementioned EMG/NCV testing revealed no electrodiagnostic evidence of an axonal neuropathy, left peripheral polyneuropathy, left median mononeuropathy, left upper limb myopathy, left cubital tunnel syndrome of the left ulnar nerve, or left brachial plexopathy.  *Id.*

On June 22, 2016, petitioner returned for a follow-up visit with Ms. Krug.  *Id.* at 17.  Petitioner reported that her "pain [had] remained the same since her last visit" with bicep pain radiating into the superior shoulder with rotation of the arm, pushing, and abduction.  *Id.*  On examination, petitioner was observed to have normal range of motion of the left upper extremity with no tenderness to palpation, normal sensation, and negative Neer's and Hawkins testing.  *Id.* at 19.  Ms. Krug referenced petitioner's subjective report of "mild discomfort at times" in the area of the bicipital groove extending into the biceps muscle; however, Ms. Krug noted that she was unable to reproduce this sensation on physical examination.  *Id.*  Ms. Krug prescribed Mobic and recommended that petitioner's care be transferred to Dr. Glennon for surgical consultation.  *Id.* at 20.

---

the applicable records indicates that these two names refer to the same individual.  Accordingly, for purposes of clarity, this decision will hereafter refer to this treating provider as "Kelsey J. Krug, PA-C."

On August 23, 2016, petitioner underwent an MRI of the left shoulder, which revealed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon; mild supraspinatus and infraspinatus tendinopathy; small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site; and minimal subacromial-subdeltoid bursitis.  Ex. 2 at 109-10.  The MRI revealed no evidence of biceps tenosynovitis.  *Id.*

On August 30, 2016, petitioner returned for a follow-up visit with Ms. Krug and reported that her symptoms remained unchanged.  Ex. 3 at 3.  On examination, petitioner was observed to have normal range of motion of the left upper extremity with no tenderness to palpation, normal sensation, and negative Neer's and Hawkins testing.  *Id.* at 5.  Ms. Krug diagnosed petitioner with non-traumatic partial left rotator cuff tear, left humerus subcortical cysts, ulnar nerve entrapment, and numbness in the left arm.  *Id.* at 6-7.  Ms. Krug recommended that petitioner continue with her oral anti-inflammatory medication, ice, and activity modifications until she made a decision regarding further treatment options.  *Id.* at 6.

On September 20, 2016, petitioner presented to Owen B. Keenan, M.D., at Marshfield Clinic – Marshfield Center for an initial evaluation of "left shoulder difficulties."  Ex. 5 at 17.  Petitioner reported that she had experienced constant discomfort localized from the acromion down to the elbow that was "especially involved" with weight-bearing activities.  *Id.*  Nevertheless, petitioner indicated that her shoulder pain had improved "by about 95%" over time.  *Id.*  An examination of petitioner's left shoulder documented 145 degrees of flexion, 150 degrees of abduction, and 65 degrees of external rotation.  *Id.* at 18.  Additionally, petitioner was observed to have "some winging" on the left-hand side, "good" strength, "marked" discomfort to resisted external rotation and abduction, and "very positive" Hawkins testing.  *Id.*  An in-office x-ray of petitioner's left shoulder revealed minimal subcortical sclerosis of the greater tuberosity at the rotator cuff footprint, likely reactive to the known rotator cuff tendinopathy; and early left acromioclavicular arthrosis.  *Id.* at 20.  In comparing the aforementioned x-ray with petitioner's MRI from August 2016, Dr. Keenan opined that at least some of the findings on imaging appeared to be the product of chronic changes rather than a discrete injury caused by petitioner's vaccination.  *Id.* at 18.  Dr. Keenan ultimately concluded that petitioner likely had a full thickness rotator cuff tear and recommended surgical intervention.  *Id.* at 18-19.

On September 30, 2016, petitioner presented to Mirela E. Sandru, M.D., at Marshfield Clinic – Marshfield Center for a preoperative evaluation for left shoulder arthroscopy.  *Id.* at 21-25.  At that time, petitioner reported "some" pain in her shoulder but presented on examination with grossly normal muscle strength and tone.  *Id.* at 24.

On October 14, 2016, petitioner underwent a left shoulder arthroscopy and subacromial bursectomy procedure with Dr. Keenan at Marshfield Clinic - Marshfield Center.  *Id.* at 32-33.  The operative report notes that, in contradiction to the August

2016 MRI scan of petitioner's left shoulder, her rotator cuff looked "excellent" with no abnormalities.  *Id.*  The operative report otherwise contains findings of "very mild" ascending tenosynovitis of the biceps tendon with no fraying and "excellent" appearance of the superior labrum and articular surface of the head/neck glenoid.  *Id.* at 33.  The operative report indicates that the procedure was completed without complications, drains, or specimens.  *Id.*

On October 18, 2016, petitioner presented to Vivienne Neerdaels, OTR, CHT, CLT, at Flambeu Hospital for an initial evaluation following her arthroscopic surgery. Ex. 7 at 1.  Petitioner denied experiencing pain at rest but stated that "light activity" could produce pain of "3" out of "10."  *Id.*  From October 18, 2016 through December 21, 2016, petitioner presented for a total of nine[5] physical therapy sessions.  *Id.* at 1-23.  At her final physical therapy visit on December 21, 2016, petitioner reported that her shoulder condition had improved compared to her pre-surgical condition, but she still experienced "achiness when reaching outwards and overhead."  *Id.* at 19.  She was assessed as having shoulder strength ranging from "4" to "5" with 160 degrees of flexion, 60 degrees of extension, 150 degrees of abduction, 60 degrees of internal rotation, and 90 degrees of external rotation.  *Id.* at 21.  Petitioner was discharged from physical therapy with a home exercise program.  *Id.*

On November 28, 2016, petitioner returned for a follow-up visit with Dr. Keenan at Marshfield Clinic – Marshfield Center.  Ex. 5 at 59.  Petitioner reported that she was not currently taking any medications and was able to sleep on her left side.  *Id.* However, petitioner noted that "[w]eather does bother her shoulder just a little bit."  *Id.* Overall, Dr. Keenan recorded that petitioner was doing "great" and advised her to continue with her physical therapy program.  *Id.*  At a subsequent treatment session with Dr. Keenan on January 30, 2017, petitioner reported that she had begun swimming again and was "having no trouble with [her] arm at all."  *Id.* at 60.  Petitioner denied experiencing any pain.  *Id.*  On examination, Dr. Keenan observed that petitioner presented with "excellent" strength and 150 degrees of forward flexion, 165 degrees of abduction, and 75 degrees of external rotation.  *Id.*  Dr. Keenan concluded that petitioner was ready to be discharged from routine follow up and would thereafter be treated on an as-needed basis.  *Id.*

## III.    Affidavits Filed by Petitioner

On July 26, 2017, petitioner filed an affidavit pursuant to § 11(c)(1).  Ex. 6.  In her affidavit, petitioner asserted that she suffered a left shoulder injury caused by the Tdap

---

[5] Petitioner's brief in support of damages asserts that petitioner presented for a total of 11 physical therapy sessions from October 18, 2016 through December 21, 2016.  Petitioner's Brief at 5.  Although petitioner was scheduled for 11 physical therapy sessions during the period in question, the applicable records reflect a "no-show" appointment on November 29, 2016 and a cancelled appointment on December 14, 2016.  Ex. 7 at 16, 18.  Accordingly, petitioner actually attended only nine physical therapy sessions from October 18, 2016 through December 21, 2016.

vaccination she received on March 14, 2016. *Id.* at ¶3. Petitioner averred that she suffered the residual effects of her injury for more than six months and had not received an award or settlement for the injury. *Id.* at ¶¶4-5.

On July 3, 2018 and July 11, 2018, petitioner filed additional affidavits from Rick Fahrenkrug (her father), Eric Knudson (her husband), Rebecca Macholl (her friend and former co-worker), Meredith Hueckman (her friend), Terese Ellis (her friend), and Kathleen Knox (her friend). Exs. 8-9, 12-15. Petitioner also submitted two additional affidavits in which she provided a more detailed description of her medical history and the impact of her shoulder injury on her activities of daily living. Exs. 10-11.

In his affidavit, Mr. Fahrenkrug described how petitioner lost her normal ability to care for her children due to her arm injury. Ex. 8 at ¶6. Mr. Fahrenkrug claimed that petitioner suffered from "continuously intense pain" and sleep disturbance due to "extreme discomfort," but nevertheless was able to balance her family obligations and job duties as the director of a community pool. *Id.* at ¶7. Mr. Fahrenkrug cited the period following petitioner's October 2016 surgery as especially difficult due to the driving limitations ordered by her physicians. *Id.* at ¶¶8-9. During this post-surgical period, Mr. Fahrenkrug recounted that he was "very concerned about [petitioner's] physical and emotional stability." *Id.* at ¶8.

Petitioner's husband, Eric Knudson, echoed several of Mr. Fahrenkrug's claims in his affidavit. Mr. Knudson emphasized that petitioner's injury and subsequent treatment limited her ability to care for their children, complete chores, and maintain attendance at work. Ex. 14 at ¶¶4-6. Mr. Knudson recounted an episode following petitioner's surgery in which she briefly lost consciousness after he removed a catheter from her arm. *Id.* at ¶5. Mr. Knudson alleged that two of his children witnessed this episode and were "very traumatized" because they thought their mother had died. *Id.*

The affidavits from Ms. Macholl, Ms. Hueckman, Ms. Ellis, and Ms. Knox reiterate that petitioner's injury caused physical and emotional distress and led to significant disruptions of her ability to work, care for her family, and perform recreational activities. Exs. 9, 12-13, 15.

In her two detailed affidavits, petitioner provided a description of her medical history and the impact of her shoulder injury on her activities of daily living. In her first affidavit dated approximately one year following her shoulder injury, petitioner described how she experienced difficulties with sleeping, caring for her children, working, performing ballet, and swimming. Ex. 10 at ¶¶2-3. Petitioner noted that her pain had improved but "remain[ed] problematic." *Id.* at ¶3. Although she described her surgery as providing some symptom relief, she averred that she still experienced weakness, residual "catching" of her arm, and episodes of itching. *Id.* at ¶¶5-6.

In petitioner's second detailed affidavit dated approximately two years following her shoulder injury, petitioner indicated that she had completed a "nearly full recovery." Ex. 11 at ¶5. Petitioner stated that her current symptoms were limited to occasional

pain in her left shoulder and itching due to surgical scars. *Id.* Nevertheless, petitioner reported that she was capable of swimming, performing ballet, and hugging her children. *Id.*

## IV.    Party Contentions

Petitioner requests reimbursement of $305.07 for past mileage expenses. Petitioner's Brief ("Pet. Brief") at 1. Respondent states that he does not object to that amount. Respondent's Brief ("Res. Brief") at 1 n.1. Thus, the only disputed issue before the undersigned is the amount of damages to be awarded for pain and suffering.

Petitioner argues that she should be awarded $130,000.00 in compensation for pain and suffering. Pet. Brief at 1. Petitioner asserts that "[p]etitioners in the Vaccine Program with analogous SIRVA injuries are routinely awarded comparable damages to what Ms. Knudson is seeking for her personal pain and suffering." *Id.* at 5. Petitioner compares the instant case to two prior cases in which damages were decided by the undersigned. *Id.* at 5-7. Specifically, petitioner cites: *Collado v. HHS*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 for unreimbursable expenses), and *Dobbins v. HHS*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 for unreimbursable expenses).

Petitioner emphasizes that she underwent treatment for eight months, which included physical therapy, MRI and x-ray imaging, EMG/NCV testing, prescription anti-inflammatories, and a left shoulder arthroscopy and subacromial bursectomy. Pet. Brief at 5. Petitioner asserts that her geographical location, as well as work and familial obligations, prevented her from presenting for necessary medical treatment, including regular physical therapy. *Id.* at 7. As a result of her injury, petitioner avers that her family and work life suffered along with her emotional health. *Id.* Due to her pain, petitioner emphasizes she was unable to care for her children as she normally would and suffered sleep deprivation. *Id.* Petitioner also references an episode during her treatment in which she lost consciousness after her husband removed a medical device from her arm. *Id.* Petitioner avers that the aforementioned episode frightened her children. *Id.*

Respondent argues that petitioner should be awarded $77,500.00 in compensation for pain and suffering. Res. Brief at 1. Respondent contends that his "position on an award of pain and suffering in this case is supported by pain and suffering awards in other Vaccine Act cases." *Id.* at 5. Respondent cites multiple SPU cases involving SIRVA claims but only provides a specific comparison of the facts of the instant case to *Collado* and *H.S. v. HHS.*, No 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015) (awarding $60,000.00 for pain and suffering). Res. Brief at 5-6. In general, respondent notes that petitioner's medical records reflect that her complaints of left shoulder pain were largely controlled with medication. Res. Brief at 4.

Respondent references petitioner's arthroscopic surgery, but notes that it occurred within six months following her vaccination and revealed that her rotator cuff was healthy with no tears. *Id.* Respondent emphasizes that petitioner's post-surgical treatment records reflect improvement of her pain and physical functioning. *Id.* at 4-5.

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. HHS,* No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. [6] *I.D.*, 2013 WL 2448125, at *9; *McAllister v. HHS,* No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering in this case. *Jane Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[7]  *Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual

---

[6] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

[7] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, which include the majority of SIRVA claims, have remained on the undersigned's docket.

claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *Graves v. HHS*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

In that regard, the undersigned notes that over the past four years the Special Processing Unit has amassed a significant history regarding damages in SIRVA cases. In *Kim v. HHS*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018. *Kim v. HHS*, No. 17-418V, 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018). The undersigned noted that the median award for cases resolved via government proffer is $100,000.00 and the median award for cases resolved via stipulation by the parties is $71,355.26.[8] *Id.* The undersigned noted that "to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case." *Id.* at *9.

Additionally, since the inception of SPU in July 2014, there have been several reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages.[9] Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

---

[8] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases. The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00. 2018 WL 3991022, at *6. Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses. *Id.* The undersigned noted that "These figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement." *Id.*

[9] *See, e.g.*, *Desrosiers v. HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017); *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); *Marino v. HHS*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018); *Collado v. HHS*, No. 17-225, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. Jun. 6, 2018); *Knauss v. HHS*, No. 16-1372V, 2018 WL 3432906 (Fed.

## VI.     Discussion

Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, petitioner appears to have suffered a mild-to-moderate shoulder injury.  Nonetheless, it was severe enough that arthroscopic surgery was recommended and performed.

Petitioner reported left shoulder pain approximately two weeks following her Tdap vaccination on March 14, 2016.  Ex. 2 at 214.  Thereafter, she reported pain at multiple treatment sessions and underwent a course of physical therapy.  Notably, petitioner reported significant improvement of her symptoms with medication and the passage of time.  For example, at treatment sessions in the weeks immediately following her injury, petitioner described her pain as ranging from a "4" to "8" out of "10." Ex. 2 at 214, 225; Ex. 4 at 2.  However, at a treatment session on April 18, 2016, petitioner reported that her pain had improved by 75% after taking Mobic and rated her current pain as "1-2" out of "10."  Ex. 3 at 26.  The available records reflect subsequent complaints of pain at treatment sessions with associated loss of functioning. Nevertheless, petitioner reported on September 20, 2016 – approximately one month prior to her left shoulder surgery – that her shoulder pain had improved "by about 95%" over the preceding months.  Ex. 5 at 17.

At treatment sessions immediately following her October 14, 2016 left shoulder arthroscopy and subacromial bursectomy procedure, petitioner reported mild pain with activity, but denied experiencing pain at rest.  Ex. 7 at 1.  The record indicates petitioner's pain, strength, and range of motion improved after nine physical therapy sessions.  *Id.* at 19-21.  Significantly, at a treatment session on January 30, 2017, petitioner reported that she had begun swimming again and was "having no trouble with [her] arm at all."  Ex. 5 at 60.  Petitioner denied experiencing any pain.  *Id.*  At that time, petitioner presented with "excellent" strength and 150 degrees of forward flexion, 165 degrees of abduction, and 75 degrees of external rotation.  *Id.*  The aforementioned treatment records are inconsistent with petitioner's subsequent affidavit in which she described ongoing weakness and pain symptoms six months following her surgery.  Ex. 10 at ¶6.

Although petitioner indicated that her pain progressively improved in the months following her March 2016 vaccination, the record does reflect multiple examinations in which she presented with reduced left shoulder range of motion, tenderness to palpation, decreased strength, and positive Neer's and Hawkins testing.  *See, e.g.*, Ex. 3 at 29-30, 38; Ex. 4 at 2; Ex. 5 at 18.  Furthermore, as indicated above, an August 2016 MRI of petitioner's left shoulder revealed mild longitudinally oriented partial-

Cl. Spec. Mstr. May 23, 2018); *Kim v. HHS,* No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. Jul. 20, 2018); and *Dobbins v. HHS*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018).

thickness tear[10] of the infraspinatus tendon; mild supraspinatus and infraspinatus tendinopathy; small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site; and minimal subacromial-subdeltoid bursitis.  Ex. 2 at 109-10. Petitioner underwent a left shoulder arthroscopic surgery in October 2016 and attended a total of 13 physical therapy sessions.  These records are reflective of some left shoulder impairment during the period at issue in this case.

The undersigned also acknowledges that additional non-medical mitigating factors are present in this case.  For instance, petitioner has credibly described her physical difficulty in caring for her children and performing other activities of daily living. Exs. 9-10.  Petitioner's affidavits as a whole reiterate that petitioner's injury caused physical and emotional distress and led to significant disruptions of her ability to work, care for her family, and perform recreational activities.  Exs. 8-15.

Overall, petitioner's injury was of relatively brief duration for a SIRVA, based on the undersigned's experience in SIRVA cases.  She was vaccinated in March 2016 and appears to have recovered by January 2017.  In January 2017, she described herself as being pain-free.  Ex. 5 at 60.  At that time, petitioner's treating physician concluded that she was ready to be discharged from routine follow up and would thereafter be treated on an as-needed basis.  *Id.*  There are no further medical records available in this case.

As described above, petitioner cites *Collado* and *Dobbins* as reflecting similar levels of pain and suffering.  Pet. Brief at 5-7.  Initially, she contends that the *Collado* petitioner's treatment history was roughly analogous in terms of its duration, medication, radiographic imaging, and amount of physical therapy.  *Id.* at 5-6.  Although the instant case is somewhat similar to *Collado*, there are some significant differences.  Notably, although the petitioner's treatment in *Collado* was of a shorter duration, the documented severity of pain was greater than petitioner's in the instant case.  Indeed, the *Collado* petitioner frequently rated her pain as at least "8" out of "10" despite medication and physical therapy.  *Collado*, 2018 WL 3433352, at *2-3.  As noted above, petitioner in the instant case reported significant improvement of her pain and other symptoms with medication and treatment.

Moreover, although both petitioners eventually underwent surgery for their shoulder injuries, the nature of the *Collado* petitioner's procedure suggests a greater degree of physical impairment.  Specifically, the March 2016 surgery in *Collado* consisted of a rotator cuff repair, subacromial decompression, open biceps tenodesis, and extensive debridement.  *Id.* at *3.  Thus, the *Collado* petitioner underwent several procedures, including an open surgical procedure.  The *Collado* decision describes the operative record as showing significant pathology.  *Id.* at *7.  By contrast, the petitioner's shoulder surgery in the instant case was performed arthroscopically and

---

[10] As indicated above, the operative record of petitioner's October 2016 left shoulder arthroscopy and subacromial bursectomy procedure noted that petitioner's rotator cuff looked "excellent" with no abnormalities.  Ex. 5 at 32-33.

consisted only of a subacromial bursectomy.  Ex. 5 at 32-33.  As indicated above, the operative record notes that petitioner's rotator cuff looked "excellent" with no abnormalities.  *Id.*  The operative record otherwise contains findings of "very mild" ascending tenosynovitis of the biceps tendon with no fraying and "excellent" appearance of the superior labrum and articular surface of the head/neck glenoid.  *Id.* at 33.  The aforementioned information suggests a greater degree of shoulder impairment in *Collado* as compared to the instant case.

Petitioner notes that, unlike the petitioner in *Collado*, she continued to experience left arm weakness, pain, and discomfort with activities more than six months following her surgery.  Pet. Brief at 6.  In support of this claim, petitioner provides a citation to her own affidavit.  *Id.*  However, as described above, at her last treatment session in January 2017, petitioner reported that she had begun swimming again and was "having no trouble with [her] arm at all."  Ex. 5 at 60.  Petitioner denied experiencing any pain. *Id.*  At that time, petitioner presented with "excellent" strength and 150 degrees of forward flexion, 165 degrees of abduction, and 75 degrees of external rotation.  *Id.*  The undersigned notes that medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life.  *Shapiro* v. *HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").  The available medical records in this case show that petitioner was pain-free by January 2017 and able to engage in her usual activities.

Turning to *Dobbins*, petitioner notes that, as in the instant case, the petitioner's treatment was of a brief duration.  Pet. Brief at 6.  However, as petitioner correctly points out, the *Dobbins* petitioner underwent 50 physical therapy sessions compared to only 13 sessions in the instant case.  *Dobbins*, 2018 WL 4611267, at *3-8.  The undersigned notes that there are additional differences between the two cases.  Indeed, as with *Collado*, the surgery in *Dobbins* was extensive and involved arthroscopic rotator cuff repair, distal clavicle resection, subacromial decompression, and biceps tenodesis. *Id.* at *3.  Thus, several procedures were performed.  During the surgery in *Dobbins*, the physician also observed a full-thickness tear involving the supraspinatus and subscapularis as well as significant labral pathology.  *Id.*  As described in greater detail above, petitioner's October 2016 surgery consisted only of a subacromial bursectomy. Ex. 5 at 32-33.  Furthermore, no significant pathology was observed on examination. *Id.* at 33.  In summary, the underlying facts of *Dobbins* also suggest a greater degree of shoulder impairment as compared to the instant case.

In his brief, respondent cites *H.S.* as being instructive in determining petitioner's pain and suffering award in the instant case.  Res. Brief at 5.  The petitioner in *H.S.* sustained head trauma and skull and vertebra fractures after experiencing syncope following a Tdap vaccination.  *H.S.*, 2015 WL 6155891, at *1-2.  The undersigned does not find the injury in *H.S.* to be sufficiently analogous to be of significant persuasive value in this case.

## VII.    Conclusion

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  In light of all of the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $110,000.00 in compensation for actual (or past) pain and suffering and $305.07 in compensation for travel expenses as stipulated by the parties.  The undersigned makes no award for projected pain and suffering, future medical expenses, or past or future lost wages.

**Accordingly, the undersigned awards petitioner a lump sum payment of $110,305.07, representing $110,000.00 in compensation for actual pain and suffering and $305.07 in compensation for travel expenses, in the form of a check payable to petitioner, Anne Knudson.**  This amount represents compensation for all damages that would be available under § 300aa-15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[11]


**IT IS SO ORDERED.**


**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.